## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JAMES MCINTYRE,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civ. No. 13-2773** |
| | : | |
| **THOMAS LICIARDELLO, et al.,** | : | |
| **Defendants.** | : | |
| | : | |

---

**Diamond, J.**             **MEMORANDUM**             **February 7, 2020**

This is one of hundreds of civil rights lawsuits arising from allegedly criminal acts committed by members of the Philadelphia Police Department's Narcotics Field Unit. The NFU Officers were prosecuted in this Court and acquitted. Alleging an illegal search and arrest, Plaintiff James McIntyre brings constitutional and state law claims against Defendant Officers Thomas Liciardello and Michael Spicer as well as the City of Philadelphia. Counsel selected the instant case to proceed as a "bellwether," while innumerable related cases remain in suspense. The City and Defendant Officers have moved for summary judgment. For the reasons that follow, I will deny the City's Motion in part, deny the Officers' Motion in its entirety, and enter judgment for Defendant Officers as to Plaintiff's emotional distress claims, which he has abandoned.

## I.    LEGAL STANDARDS

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must initially show the absence of any genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). An issue is "genuine" if there is evidence on which a reasonable fact finder could return a verdict for the nonmoving party. Kaucher v. Cty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248 (1986)).  A factual dispute is "material" if it might affect the case's outcome under governing law.  Id. (citing Anderson, 477 U.S. at 248).  I must view the facts and draw all reasonable inferences in the opposing party's favor, although "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 252 (3d Cir. 2010); see Anderson 477 U.S. at 255.

If the moving party satisfies its burden, the opposing party must then show a disputed material factual issue.  It is not enough simply to reiterate factual allegations or "show some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rather, the nonmoving party must establish a triable issue by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute."  Fed. R. Civ. P. 56(c).  Finally, summary judgment is appropriate if the responding party fails to make a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

## II.    FACTS

These are drawn from the Parties' statements of undisputed material facts, as well as from the depositions, discovery responses, exhibits, and other record documents.  (Doc. Nos. 199, 200, 204.)  At this stage, "it is inappropriate . . . to make credibility determinations."  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).  I have thus resolved factual disputes and construed the record in Plaintiff's favor. Hugh v. Butler Cty. Family YMCA, 418

F.3d 265, 267 (3d Cir. 2005).

## A.     Defendants Arrest McIntyre

On the afternoon of June 23, 2011, Plaintiff drove a "big dump truck" loaded with stucco and scrap from a jobsite in South Philadelphia to his friend Warren "Chip" Layre's garage in West Mount Airy.  (Deposition of James McIntyre, Ex. 1 to Plaintiff's Opp'n, Doc. No. 204, at 86:3, 93:8–11.)  Because Layre was absent when Plaintiff arrived, he sat on the garage steps to wait. (Liciardello & Spicer Statement of Undisputed Material Facts, Doc. No. 199, at ¶ 10 ("L&S SUMF"); Plaintiff's Response to Defendants Liciardello and Spicer's Statement of "Undisputed" Material Facts, Doc. No. 204-1, ¶ 10 ("Plaintiff's Response to L&S SUMF").)  Plaintiff intended to have a "step welded onto the back of" his truck.  (McIntyre Dep. at 93:9–10.)

Once Layre arrived, Plaintiff asked him for a $30,000 to $40,000 loan to pay off a lien on the home of Plaintiff's mother.  (Id. at 141:15–142:3.)  Layre, who had loaned Plaintiff money in the past, agreed.  Layre took Plaintiff to the back of the garage, where he counted out $33,000 in cash, rolled it up in a sock, and handed it to Plaintiff.  (Id. at 145:20–146:5.)  Plaintiff placed the cash filled sock in his lunch cooler, which—at Layre's suggestion—he threw into the "back [of the dump truck] with all the junk."  (Id. at 155:4, 156:13–17.)  Plaintiff believed the cash would be safer with the junk if he "got pulled over" or was "robbed."  (Id. at 156: 14–15.)  Plaintiff left the garage driving the dump truck. (Id. at 161.)

Police were surveilling Layre on June 23, 2011.  (L&S SUMF ¶ 9; Plaintiff's Response to L&S SUMF ¶ 9.)  Defendant Officer Thomas Liciardello, along with NFU Officer John Speiser (who is no longer a Defendant), followed Layre as he drove to Norristown to pick up a friend; the Officers followed the men back to the garage, where Plaintiff waited for Layre.  (L&S SUMF ¶ 9; Plaintiff's Response to L&S SUMF ¶ 9.)  Speiser left the area, and Defendant Officer Michael

Spicer took his place. (Deposition of Thomas Liciardello, Ex. D to Defendants Liciardello & Spicer's Mot. Summ. J., Doc. No. 199, at 31:13–19.)

This surveillance of Layre was based entirely on information Liciardello had received from Anthony Axe, who had told police a man named Chip "was selling large amounts of methamphetamine[ ] from his garage." (Arrest Report, Ex. A to L&S Mot. Summ. J. at 2.) Liciardello characterized Axe as a "reliable source" who had twice provided information aiding in arrests of drug dealers. (Liciardello Dep. at 131:20–132:2; see also Deposition of Michael Spicer, Ex. E to Defendants Liciardello & Spicer's Mot. Summ. J., at 116:7–117:10 (noting that Axe had never worked with Spicer).) Axe said nothing to about Plaintiff. (Liciardello Dep. at 133:24–134:2.)

Liciardello was known to make improper arrangements with his "reliable sources." (Deposition of Reggie Graham, Ex. 20 to Plaintiff's Opp'n, at 77:2–8; Deposition of Jeffrey Walker, Ex. 8 to Plaintiff's Opp'n, at 86:21–87:20, 756:9–764:21.) When an Officer uses a "reliable source" without first formally enrolling him as a criminal informant, the PPD and District Attorney's Office cannot determine whether he is "reliable": whether the source is receiving an appropriate level of compensation or leniency; amd whether the source's "tips" are truthful. (E.g. Walker Dep. at 761:1–8.) Regular use of such off-the-books "reliable sources" is thus contrary to PPD policy. (Id. 761:17–762:1; cf. McCann Memo, Ex. 25 to Plaintiff's Opp'n.)

Plaintiff and Layre remained in the garage for about three hours. Defendants testified that they saw Layre "retrieve [a] tan purse" from his car and Plaintiff "leave the Garage to retrieve" his lunch cooler from th dump truck. (L&S SUMF ¶ 13.) Plaintiff testified that he had brought the lunch cooler into the garage with him when Layre arrived. (Plaintiff's Response to L&S SUMF ¶ 13.) Defendants saw Plaintiff throw the cooler "into the dumpster portion of his vehicle." (L&S

SUMF ¶ 15; see Plaintiff's Response to L&S SUMF ¶ 15.) Because they found this suspicious, Defendants followed Plaintiff, and Spicer ordered a uniformed Officer in a patrol car to stop Plaintiff's truck. (L&S SUMF ¶ 17; Plaintiff's Response to L&S SUMF ¶ 17.) Once the Officer stopped the truck, Defendants excused him. Spicer told Plaintiff he had been pulled over because police believed he was involved in a (fictitious) hit-and-run accident. (L&S SUMF ¶ 21; Plaintiff's Response to L&S SUMF ¶ 21.) Although Plaintiff's dump truck was not authorized for use on state roads and he was driving with a suspended license, Defendants did not know this at the time: until they sought summary judgment, they did not mention either as a reason for stopping Plaintiff. (See L&S SUMF ¶ 19; McIntyre Dep. at 172:09–13; Arrest Rep. at 2.) Plaintiff testified that he told Defendants he had come from his "buddy's garage." (Compare L&S SUMF ¶¶ 20–21; Plaintiff's Response to L&S SUMF ¶¶ 20–21.) Defendants took Plaintiff's phone, handcuffed him, put him in the back of their car, and began questioning him about Warren Layre and drug activity at the garage. (McIntyre Dep. at 172–79.)

Without seeking Plaintiff's consent, Defendants then searched his dump truck. (McIntyre Dep. at 181:12–14; see also Arrest Report, at 2. But see Spicer Dep. at 140:11–13.) Spicer opened the truck's back door and took the cooler. (L&S SUMF ¶ 22–23; Plaintiff's Response to L&S SUMF ¶¶ 22–23.) Defendants smiled as they opened the cooler. (McIntyre Dep. at 180:8–11.) They moved the vehicles from the roadside; Liciardello, accompanied by Plaintiff, drove Defendant Officers' car, and Spicer drove Plaintiff's truck. (Id. at 186:14.) Liciardello continued questioning Plaintiff about Layre, accusing Plaintiff of possessing "drug money." (Id. at 194:19.) As Spicer approached the police car holding the cooler, he pulled out a baggie of methamphetamine. (Id. at 192:10–13.) Pressing Plaintiff for information about Layre, Defendant Officers threatened that the methamphetamine—which Liciardello said he could "make . . .

disappear"—would otherwise subject Plaintiff to a thirty-year prison sentence. (Id. at 199:2–10.) Plaintiff offered no information.

Plaintiff testified that the cooler held $33,000 in cash; the police property receipt notes a recovery of only $24,000. (McIntyre Dep. at 150:14–21; Property Receipt, Ex. 11 to Plaintiff's Opp'n, at 2.) Defendants acknowledge that at the time of the seizure, they did not place the money in an evidence bag. (Liciardello Dep. at 56:10–20.) Plaintiff testified that Defendants planted drugs—including a baggie of methamphetamine—inside the cooler and then falsely accused Plaintiff of possessing them. (McIntyre Dep. at 199:21–200:4.)

With Plaintiff handcuffed in the back of Defendants' car, they returned to Layre's garage to resume surveillance. (L&S SUMF ¶ 24; Plaintiff's Response to L&S SUMF ¶ 24.) Eventually, Defendants left Plaintiff in the car while they searched the garage, recovering over 500 grams of methamphetamine, firearms, and cash. (L&S SUMF ¶ 29; Plaintiff's Response to L&S SUMF ¶ 29.) Plaintiff was charged with various state law drug offenses. (L&S SUMF ¶ 35; Plaintiff's Response to L&S SUMF ¶ 35.)

After Plaintiff's September 21, 2011 preliminary hearing at which Defendant Officers testified, a Philadelphia Municipal Court Judge held Plaintiff's criminal charges over for trial. (Tr. of Preliminary Hr'g Ex. B to L&S SUMF, at 79:5–8.) Liciardello testified that upon entering Layre's garage, he observed a single "baggie" of methamphetamine, describing this baggie as "identical" to that found in Plaintiff's cooler. (Probable Cause Hr'g Tr. at 9:19–24; Arrest Rep. at 3.) Plaintiff was arraigned on conspiracy and drug charges. He remained incarcerated for some four months.

The District Attorney's Office *nolle prossed* Plaintiff's charges on December 3, 2012. This coincided with District Attorney Seth Williams's letter to Philadelphia Police Commissioner

Charles Ramsey, stating that the DAO would no longer call Defendants and other named NFU Officers as witnesses. (Williams Letter, Ex. 12 to Plaintiff's Opp'n.) Williams further explained that his Office would "no longer approve any search or arrest warrants in narcotics cases when any of these Officers is the affiant, nor if the probable cause portion of the warrant contains any averments from any of these officers." (Id.) The Letter reflected the DAO's efforts to insulate itself from the scandal that would ensue if the public learned that the Office had taken no action after learning of the Officers' wrongful conduct. (See, e.g., Deposition of Curtis Douglas, Ex. 17 to Plaintiff's Opp'n, at 141:14–142:10. ("I do know that there was a cloud of suspicion over those guys at the time. And it could have been that we just, we the [DA's] office wanted to protect ourselves.").)

### B. Philadelphia Police Department Policies

The PPD has adopted detailed Directives that, *inter alia*, prescribe procedures for identifying, investigating, and remedying police misconduct. The Parties agree about the substance of these policies (which I will set out), but dispute whether the PPD has adequately enforced them.

The PPD has directed that all Officers "have a duty and responsibility to report corruption, misconduct, or other improper acts" committed by PPD employees. (Defendant City of Philadelphia's Statement of Undisputed Material Facts, Doc. No. 200, ¶ 10 ("City's SUMF"); see Plaintiff's Response to City's SUMF, Doc. No. 204-2, ¶ 10.) Reporting may be done outside the chain of command and anonymously. PPD policy incorporates Pennsylvania's statutory whistleblower protections. (Directive 114, Ex. B to City's Mot. Summ. J., Doc. No. 200, at 3); 43 P.S. § 1421.

Directive 9 (now numbered 5.1) governs NFU investigations. (City's SUMF ¶¶ 4–9;

Plaintiff's Response to City's SUMF ¶¶ 4–9.) In pertinent part, the Directive provides instruction to Officers in the preparation of property receipts after seizing evidence. (Directive 9, Ex. A to City's Mot. Summ. J.) It details a forfeiture protocol, noting that "mere possession of money by a suspected drug violator *does not* subject that money to forfeiture." (Id. at 16 (emphasis in original).) Rather, currency is subject to forfeit when, *inter alia*, the Officer has probable cause to believe it is connected to a drug transaction.

Both reports of misconduct and citizen complaints are investigated by the PPD's Internal Affairs Bureau, which is also the Department's "central control agency and repository of completed investigations for the Police Department in all cases of citizens' complaints against the police." (Directive 127 ("Complaints against the [PPD]"), Ex. C to City's Mot. Summ. J.) The IAB Chief Inspector (or his designee) must evaluate all complaints the IAB receives, and then determine whether to refer a complaint to a police district or unit for investigation. (Id.) Complaints of less serious officer misconduct—lack of service, verbal abuse, and traffic ticket grievances—are investigated by the Officer's district. "All criminal allegations [are] investigated by IAB." (Id. at 4.) Every complaint is logged on a master form, and the IAB immediately notifies "the ranking supervisor on duty in the district unit of the complaint." (Id.)

Complaints remaining with the IAB are assigned to an IAB Staff Inspector for investigation. The IAB must provide a copy of the Citizen's Complaint Report to the DAO within twenty-four hours of receipt. The IAB Staff Inspector must complete her investigation within seventy-five days (unless special circumstances require additional time), and compile a file containing: the statement of the complainant; the statement of the Officer(s); the statements of any neutral persons interviewed; all documents, records, and reports relating to the investigation; and a report that includes a complete summary of the investigation, findings/conclusions, and the

names of Officers assisting in the investigation with a description of their roles.  (Id. at 6.)  The Chief Inspector then reviews the entire report and, if he approves it, forwards it "through the chain of command to the Police Commissioner for final disposition."  (Id.)

The subject Officer's commanding Officer prepares a memorandum that the subject Officer and his immediate supervisor must review, describing any action taken.  If the investigation leads to imposition of discipline, the PPD's Disciplinary Procedures are triggered.  (Directive 8.6, Ex. D to City's Mot. Summ. J.)  An accused Officer is afforded robust procedural rights should he oppose discipline.

### C.    The IAB's Deficiencies

The IAB functioned poorly, in part because of a perception that it operated corruptly: investigators did not maintain confidentiality, and preferred Officers (including Liciardello) were protected by supervisors.  (Douglas Dep. at 46:18–47:15; Graham Dep. at 89:2–14.)  "Defendants were protected from IAB investigations by their superiors, and had inside sources inside IAB that divulged confidential information to them in order to stymie the investigations."  (Plaintiff's Response to City's SUMF ¶ 17.)  Former NFU Officer Jeffrey Walker testified that information reported confidentially to an IAB investigator was leaked to the subject Officer, Liciardello.  (Walker Dep. at 176:21–177:12.)  Graham also testified that information he reported to the IAB in confidence was leaked to his commanding Officer.  (Graham Dep. at 89:2–14 ("And [Graham's Sergeant] basically told [Graham] off because [the Sergeant] heard what was going on down at internal affairs.  That's not supposed to happen.").)  Such leaks were confirmed by Deputy District Attorney Douglas—head of the DAO's Investigations Division—who was reluctant to report NFU misconduct to the PPD because the internal review system was compromised.  (Douglas Dep. at 46:18–47:15.)

Further, federal investigators uncovered repeated instances of misconduct implicating Defendants' supervisor Sergeant Joseph McCloskey, and believed that McCloskey was "not truthful numerous times during his FBI interview." (Internal Investigation, Internal Affairs Division # 14-1401, Ex. 26 to Plaintiff's Opp'n, at 3.) Yet, Commissioner Ramsey closed the IAB investigation of McCloskey without taking any action. (Id. at 3.)

As disturbing, former NFU Officer Stephen Dmytryk told federal investigators that Liciardello, "[i]n practice . . . ran [the NFU] squad." (Dmytryk FBI Interview, Ex. 19 to Plaintiff's Opp'n, at 4.) Liciardello wielded outsized influence because he "produced such high numbers of arrests and drug seizures," earning the approval of PPD management, including Deputy Commissioner William Blackburn. (Id.) NFU Officer Reggie Graham similarly testified about Defendants' misconduct and outsized influence, noting that his attempts to report them to the City Solicitor's Office and the PPD were rebuffed. (Graham Dep. at 62:23–63:3, 74:1–15, 76:3–18, 98:17–100:23.) Deputy DA Douglas testified that Captain Chris Werner (who oversaw the NFU) and then–IAB Inspector Blackburn "covered for" Liciardello's improprieties. (Douglas Dep. at 45:8–47:6.) Douglas thus referred information involving NFU Officers to the FBI rather than to the PPD. (E.g. id. at 49:2–6.)

### D. Defendants' Reported History of Misconduct

Liciardello joined the PPD in 1995 and was assigned to the NFU in November 2000. When the Williams Letter issued in December 2012, Liciardello had been subject of twenty complaints, ten internal investigations, and four "Police Board of Inquiry" hearings. (Concise Officer History of Thomas Liciardello, Ex. 21 to Plaintiff's Opp'n.) Most of the complaints and allegations were not "sustained," although several investigations were closed without findings. One complaint—that Liciardello struck a citizen in his genitals with a baton because the citizen refused to provide

information—was "referred" to the FBI.  (See id.)  During that same period, complaints against him were "sustained" nine times.  (Id.)  Some were minor infractions, such as failing to appear in court or disobeying an order regarding outside employment.  Liciardello was also found responsible for disturbing misconduct, however.  For instance, a 2005 NFU audit found "a discrepancy . . . between the amount of money recorded on [a property receipt] and the amount turned into the evidence custodian."  (Id. at 7.)  Five of the sustained charges against Liciardello were for improper stops, searches, or seizures—including one involving physical violence.

Spicer also joined the PPD in 1995.  When Williams issued his Letter, Spicer had been the subject of fifteen complaints and two internal investigations.  (Concise Officer History of Michael Spicer, Ex. 23 to Plaintiff's Opp'n.)  He was twice cited for misconduct: in 2006 for making a false entry in departmental records and using offensive language or conduct; and in 2008 for routinely showing up late for court (resulting in a three-day suspension).

### E.  Investigations of Defendants

The Williams Letter appears to have been conceived by DA Williams and his senior staff, including Trial Division Deputy Ed McCann, who testified that the DAO's "main concern was . . . that [they] didn't want another narcotics scandal on [their] watch" (referring to drug squad scandals that arose in the 1990s).  (Deposition of Edward McCann, Jr., Ex. 14 to Plaintiff's Opp'n, at 19:8–14.)  Williams did not recall reviewing the PPD's investigative materials before issuing the Letter.  (City's SUMF ¶ 53; Plaintiff's Response to City's SUMF ¶ 53.)  Moreover, the Williams Letter issued without a meeting between the DAO and the PPD to formulate a response to alleged NFU misconduct.  (City's SUMF ¶ 58; Plaintiff's Response to City's SUMF ¶ 58.)

Remarkably, even though McCann compiled an NFU file (containing IAB and other complaints), the DAO did not conduct its own investigation before sending the Williams Letter.

(McCann Dep. at 23:14–17, 25:10–16, 26:17–23, 49:17–23 ("No. We were not doing an investigation. We have a lot of allegations. We have a pattern of behavior.").) Rather, the Office relied almost entirely on the IAB investigation, even though the DAO believed that the IAB had compromised leadership and leaked to the NFU. Worse, the Office directed those aggrieved by NFU Officers' wrongdoing to the PPD, knowing the complaints would then be referred to the IAB. (McCann Dep. at 18:7–14.) Although McCann did not recall how the DAO selected the six Officers named in the Letter, he noted that criminal defendants had made "a lot of allegations" against NFU Officers, leading to a view that there was "a pattern of behavior." (Id. at 49:18–19.)

Following the Williams Letter, McCann had conversations with Deputy Commissioner Blackburn and IAB Chief Inspector Flacco regarding NFU Officers' improper "side deals." (Id. at 59:18–60:24.) Through earlier conversations with Blackburn, McCann was aware of these "deals," where the Officers and suspects would conduct informal "plea bargaining" on the street, exchanging information for the Officers' promise not to show up to court. (Id. at 16:17–17:9.) Through conversations with his DAO colleagues, McCann also learned in early 2012 of allegations against NFU Officers concerning "theft of money and drugs." (Id. at 17:5.) McCann knew that the United States Attorney's Office had stopped adopting cases involving certain NFU Officers—including Liciardello—some eight years before the Williams Letter. (Id. at 50:2–6, 14–18.)

Jeffrey Walker, an NFU Officer who who pled guilty to corruption charges, testified for the Government at Defendant Officers' criminal trial, offered deposition testimony of Defendants' wrongdoing. (Internal Investigation, IAD # 14-1401, Ex. 26 to City's Mot. Summ. J.) Walker described how he and his NFU colleagues, including Defendants, fabricated probable cause, stole drugs and money, and engaged in illicit side deals with suspects and defendants. (E.g. Walker Dep. at 43:24–44:7, 90:7–15, 704:12–705:12, 715:17–716:24, 756:4–763:14; see also id. at 41:12–42:2,

740:20–749:22 (describing his own misconduct).)  Walker confirmed that Liciardello improperly kept informants outside the PPD's criminal informant system.  (<u>Id.</u> at 761:1–764:21.)  Similarly, former NFU Officer Dmytryk told federal investigators that drug dealers, including one of Dmytryk's sources, "were claiming that Liciardello was stealing money from them."  (Dmytryk FBI Interview, at 4.)

Dating back to 2010, senior DAO prosecutors mistrusted these NFU Officers: "they [created] side deals with suspects and defendants," "their paperwork looked suspiciously similar," and "various suspects in different drug cases when they were proffering . . . would provide similar stories of misconduct on the part of NFU officers."  (Deposition of Benjamin Jackal [Rule 30(b)(6) Witness for City of Philadelphia], Ex. 15 to Plaintiff's Opp'n, at 22:13–23:11.)

The DAO thus knew for at least two years before the Williams Letter of Defendants' questionable conduct and reputation.  Moreover, in June 2012 (six months before the Williams Letter), the DAO's Special Investigation Unit ran a "search for complaints . . . regarding" NFU Officers, and compiled the results in a memorandum.  (SIU Memorandum, Ex. 16 to Plaintiff's Opp'n.)  SIU found ten reported complaints from 1999 to 2011 accusing Spicer of misconduct, including planting evidence and conducting improper searches.  (<u>Id.</u> at 1.)  SIU learned of nineteen complaints filed against Liciardello from 1998 to 2011.  (<u>Id.</u> at 1–2.)  These complainants accused Liciardello of, *inter alia*, fabricating evidence, conducting illegal searches, and assaulting suspects. (<u>Id.</u>)

After the Williams Letter, Defendants and other implicated Officers were reassigned to administrative duties.  (Deposition of Charles Ramsey, Ex. 13 to Plaintiff's Opp'n, at 136:20–137:6.)  On December 14, 2012, the IAB began investigating the Officers and so notified the DAO. (Letter from Chief Inspector Christopher Flacco to DA Seth Williams, Ex. K to City's SUMF.)

"The tipping point for the DAO" was a January 2012 NFU arrest (not involving Plaintiff). (Levins Report, Ex. G to City's SUMF.) During the prosecution that followed, the state court ordered the DAO to "provide information to the defense of allegations of theft of money and drugs." (Id.) Rather than comply, the DAO issued the Williams Letter, subsequently withdrawing hundreds of prosecutions in which the Defendant Officers were involved.

On January 8, 2013, McCann explained to IAB Chief Inspector Flacco that the DAO had received complaints about NFU Officers, describing their off-the-books dealings with defendants. (McCann Dep. at 32:12–33:3.) McCann testified that he "provided specific reasons" for the decision memorialized in the Williams Letter. (McCann Dep. at 31:8–11.) Yet, McCann did not provide Flacco with "documentation pertaining to alleged theft, false arrests, or planting of evidence by the NFU Officers." (City's SUMF ¶ 67; Plaintiff's Response to City's SUMF ¶ 67.)

The IAB investigation that followed the Williams Letter was closed without findings on October 28, 2013. (Levins Report; Flacco Dep. at 49:17–53:1.) Flacco assigned Staff Inspector Theresa Levins as the "investigator of record." (Deposition of Theresa Levins, Ex. 28 to Plaintiff's Opp'n, at 10:11–13, 16:9–16.) Levins "wrote" the memorandum closing the investigation based on information provided to her, but "did not conduct the investigation," which was handled by her boss, Flacco, whose "investigation" was minimal. (Levins Dep. at 10:11–13, 61:2–23; Levins Rep.) This arrangement was quite unusual. (Levins. Dep. at 63:22–23.) Typically, IAB investigations are assigned to a lower-ranking inspector and then reviewed by superiors. (Id. 51:3–9, 63:14–64:2.) The resulting barebones "investigative analysis" was Flacco's alone: Levins performed no actual, independent review beyond reviewing the Officers' biographical information. The memorandum thus drafted by Levins at Flacco's direction was finalized ten months after the Williams Letter.

### F.    Federal Investigation and Indictment

Federal authorities started investigating Defendants well before the IAB did so. (Deposition of Seth Williams, Ex. 13 to Plaintiff's Opp'n, at 124:17–18; Federal Indictment, Ex. L to City's Mot. Summ. J.)  The FBI Public Corruption Squad began an investigation of NFU misconduct in May 2007, after it received information that Liciardello "was falsifying police reports" and failing to report all seized evidence.  (E.g. Internal Investigation, IAD #14-1401.) This two-year investigation resulted in no charges.

After the FBI acquired a "new source" alleging corrupt practices by Liciardello and other NFU Officers, the Bureau reopened the investigation on November 29, 2010.  (Id.)  A Joint Task Force comprised of FBI Agents and specially assigned PPD personnel investigated the NFU, including Defendants, from 2010 through 2012.  This joint effort was "confidential" in nature. (Ramsey Dep. at 97:2–8.)  The FBI advised Commissioner Ramsey of the investigation, and he informed PPD personnel on a "need to know basis."  (Id.)  As might be expected, however, others in the PPD learned of the federal investigation. That knowledge of the Joint Task Force led some within the PPD to refer allegations of NFU corruption to federal authorities rather than to the Department or the DAO.  (Douglas Dep. at 35:19–36:4.)  Ramsey testified that he did not take any action against the subject NFU Officers because he believed it might interfere with the federal inquiry.  (City's SUMF ¶ 76.)

The Joint Task Force investigation resulted in a July 29, 2014 indictment, charging Liciardello, Spicer, and other NFU Officers with, *inter alia*, RICO conspiracy relating to robberies and extortions they carried out while cloaked in state authority.  (Federal Indictment.)  A six-week jury trial concluded with not guilty verdicts on all charges on May 14, 2015.  An arbitrator restored Defendant Officers to their PPD jobs, and "prevented [the PPD] from conducting an administrative

investigation into the conduct of the officers." (Internal Investigation, IAD #1401.)

### III. PROCEDURAL HISTORY

Plaintiff initiated the instant action on May 20, 2013. (Doc. No. 1.) The Parties stipulated to the dismissal of other NFU Officers: Defendants Robert Otto, John Speiser, and Brian Reynolds (who were not directly involved in Plaintiff's arrest). (Doc. Nos. 192, 197.) On July 8, 2019, the Parties stipulated to the dismissal of Plaintiff's § 1983 claims of excessive force and assault (Counts I and III), and his supplemental state law claims of assault and battery (Counts II and IV). (Doc. No. 198.) In his response to Defendant Officers' Motion for Summary Judgment, Plaintiff agreed to the dismissal of his state law intentional and negligent infliction of emotional distress (Counts XII and XIII). (Doc. No. 204.) The claims remaining against Liciardello and Spicer are: unlawful arrest, unlawful search and seizure, malicious prosecution, and conspiracy to violate civil rights under § 1983 (Counts V, VII, VIII, and X); and state law claims of false imprisonment, malicious prosecution, and civil conspiracy (Counts VI, IX, and XI). Plaintiff's § 1983 claim against the City (Count XIV) also remains. The matter has been fully briefed. (Doc. Nos. 199, 200, 204, 207, 208, 213.)

### IV. DISCUSSION

#### A. Defendant Officers

Pursuant to § 1983, a plaintiff may seek redress for constitutional violations committed by state actors. 42 U.S.C. § 1983. Plaintiff's § 1983 unlawful arrest, malicious prosecution, and unlawful search and seizure claims, as well as his state law malicious prosecution and false imprisonment counts require him to show that Defendants lacked reasonable suspicion to stop him or probable cause to search and arrest him. I will address the probable cause question before turning to each claim and Defendant Officers' qualified immunity arguments.

***Probable Cause***

The same standard governs Plaintiff's state and federal claims: "A police officer has probable cause to conduct a search when 'the facts available to [him] would warrant a [person] of reasonable caution in the belief' that contraband or evidence of a crime is present." <u>Florida v. Harris</u>, 568 U.S. 237, 243 (2013) (quoting <u>Texas v. Brown</u>, 460 U.S. 730, 742 (1983) (plurality opinion) (alteration in original)); <u>Renk v. City of Pittsburgh</u>, 641 A.2d 289, 293 (Pa. 1994).  A police officer has probable cause to arrest when he "has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." <u>Simpson v. City of New York</u>, 793 F.3d 259, 265 (2d Cir. 2015) (internal quotation marks and citation omitted).  Probable cause is "a fluid concept"; the probable cause inquiry requires a "flexible, all-things-considered approach." <u>Harris</u>, 568 U.S. at 245 (internal quotation marks and citation omitted).

Traffic stops may be based on probable cause or reasonable suspicion.  A routine traffic stop is thus "more analogous to a co-called <u>Terry</u> stop . . . than to a formal arrest." <u>Berkemer v. McCarty</u>, 468 U.S. 420, 439 (1984) (citation and footnote omitted).  "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted to stop." <u>Rodriguez v. United States</u>, 135 S. Ct. 1609, 1614 (2015).  A police officer may thus take action consistent with ensuring safe roadways, such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." <u>Id.</u>  To make an arrest, however, the officer must first learn "facts which demonstrate the ripening of probable cause." <u>United States v. Prieto-Villa</u>, 910 F.2d 601, 605 (9th Cir. 1990).

The reasonableness of a suspect's search and seizure is usually a jury question. <u>See</u> <u>Montgomery v. De Simone</u>, 159 F.3d 120, 124 (3d Cir. 1998).

Defendants argue that they had reasonable suspicion to stop Plaintiff when they saw him "deliberately and purposefully throw the small lunch cooler into the large open-air, rear dumpster portion of his dump truck." (L&S Mot. Summ. J. at 5.) They argue this "unordinary and deliberate conduct demonstrated suspicious behavior that required further investigation." (<u>Id.</u> at 6.) I do not agree.

An investigatory stop must be premised on reasonable suspicion that "criminal activity may be afoot." <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968). The Officers have not explained how Plaintiff's conduct was "unordinary" or suggested criminal activity. To the contrary, Liciardello testified that the duration of Plaintiff's visit to Layre's garage suggested he was *not* involved in a drug deal, and that Defendants "would have never stopped him, because he was in there so long, based on [their] experience. [They] would have never stopped him if he [ha]dn't throw that cooler bag into the back of the truck." (Liciardello Dep. at 146:2–8; <u>see also</u> <u>id.</u> at 148:16–23.)

Under any standard of reasonableness, Plaintiff tossing the cooler into his truck was not by itself suspicious and could not possibly justify stopping Plaintiff to "obtain additional evidence." (L&S Mot. Summ. J. at 6.) Moreover, the reliability of Axe's "off the books" information is disputed, and Defendants acknowledge Axe offered no information about Plaintiff. (Graham Dep. at 75:1–6; Walker Dep. at 86:21–87:20; <u>see</u> Liciardello Dep. at 133:24–134:2.)

Defendant Officers nonetheless argue that the stop was warranted because Plaintiff now admits his driver's license had been suspended and that he was driving a vehicle unauthorized for use on state roads. (L&S SUMF ¶ 19; Plaintiff's Response to L&S SUMF ¶ 19.) Had Defendants stopped Plaintiff for either of these reason—even as a pretext for further investigation—that might

have been permissible.  See Whren v. United States, 517 U.S. 806, 813 (1996).  Unfortunately for Defendants, however, they did not offer their "pretext" until years later.  After stopping Plaintiff, Defendants made up a hit-and-run accident as "a ruse to find out" where Plaintiff had been. (Liciardello Dep. at 150:2–3.)  They provide no evidence to suggest that they, or the Patrol Officer who executed the stop, knew of  Plaintiff's suspended license or that his dump truck was unauthorized to be on the road.  Although "an officer may conduct a pretextual stop based on a traffic violation and then . . . extend the stop if the officer develops reasonable suspicion," the initial stop must be based on a violation the police actually knew or observed at the time.  United States v. Gomez, 877 F.3d 76, 93 n. 27 (2d Cir. 2017); see See Florida v. J.L., 529 U.S. 266, 271 (2000) ("The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search."); United States v. Ubiles, 224 F.3d 213, at 218 (3d Cir. 2000) ("This post-hoc justification for stops and searches has been repeatedly rejected.").

Here, the record confirms that Defendants instructed the Patrol Officer to stop Plaintiff for no reason.  At Plaintiff's state court preliminary hearing, Defendants testified that they gave the Patrol Officer no reason for the stop, telling him only the vehicle's direction of travel and license plate tag.  (Probable Cause Hr'g Tr. at 34:12–16.)  By their own admission, Defendant Officers thus had no lawful reason to stop Plaintiff.

Moreover, although Defendants insist that Plaintiff consented to the truck search, this is disputed.    See United States v. Matlock, 415 U.S. 164, 165–66 (1975) (voluntary consent eliminates need for probable cause).  Whether a suspect consented to a search is a  "question[s] of fact to be determined from the totality of all the circumstances."  Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973).  Plaintiff testified that Defendants never asked him for permission before they searched the truck and removed and opened his cooler.  (McIntyre Dep. at 181:12–14); see

Graham v. F.B. Leopold Co., 779 F.2d 170, 173 (3d Cir. 1985) (plaintiff's deposition testimony could suffice to create a genuine factual dispute); see also United States v. Stein, 881 F.3d 853, 858 (11th Cir. 2018) (en banc) ("[E]ven in the absence of collaborative evidence, a plaintiff's own testimony may be sufficient to withstand summary judgment.").

Without Plaintiff's consent, Defendants had no lawful basis to search his truck. In these circumstances, Plaintiff placing the cooler in the back of his open truck could not possibly establish probable cause.

Finally, Defendants have not established that they had probable cause to arrest Plaintiff. Although probable cause would have arisen had Defendant Officers lawfully recovered contraband from the cooler, Plaintiff testified that Defendants planted those drugs and stole some of his cash. (McIntyre Dep. at 199:21–200:4.) Because I may not at summary judgment evaluate Plaintiff's credibility, the propriety of Plaintiff's arrest must thus be resolved by a jury.

### *Section 1983 Unlawful Arrest*

To prevail on this claim, Plaintiff must show Defendants had no probable cause to arrest him. Dowling v. City of Philadelphia, 855 F.2d 136, 141 (3d Cir. 1988) ("[T]he existence of probable cause is the threshold issue."). As I have discussed, the probable cause question turns largely on whether Defendants found drugs in Plaintiff's cooler. Although Plaintiff's explanation for possessing $33,000 in cash and hiding it in the cooler is dubious, Defendant Officers do not argue that their recovery of the cash (which they recorded as $24,000) gave rise to probable cause—nor could they so argue, given that the legality of the cooler's seizure is disputed. Defendants are thus not entitled to summary judgment on this claim.

### *Section 1983 Unlawful Search and Seizure*

Plaintiff must show Defendants "unreasonably" searched or seized him: that they initiated

their investigatory stop without reasonable suspicion, or that they searched and seized him without probable cause.  See United States v. Brown, 765 F.3d 278, 288 (3d Cir. 2014).  Once again, whether Defendants complied with the Fourth Amendment turns on disputed factual questions. Summary judgment is thus inappropriate.

### Section 1983 and Pennsylvania Malicious Prosecution

To make out a federal claim of malicious prosecution, Plaintiff must establish that:

 (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

DiBella v. Borough of Beachwood, 407 F.3d 599, 601 (3d Cir. 2005) (internal quotation marks and citation omitted).  Pennsylvania's malicious prosecution tort has substantially the same elements:

(1) the defendants initiated a criminal proceeding; (2) without probable cause; (3) with malice; (4) which was subsequently terminated in plaintiff's favor.

Russoli v. Salisbury Twp., 126 F. Supp. 2d 821, 870 (E.D. Pa. 2000) (citing, inter alia, Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 791 (3d Cir. 2000)).

Defendants concede three of these elements, contesting only probable cause and malice. As I have discussed, whether Defendants had probable cause to arrest Plaintiff turns on disputed factual issues  See Halsey v. Pfeiffer, 750 F.3d 273, 300 (3d Cir. 2014) ("It certainly is inappropriate for a court to grant a defendant officer's motion for summary judgment in a malicious prosecution case if there are underlying factual disputes bearing on the issue or if 'reasonable minds could differ' on whether he had probable cause for the institution of the criminal proceedings based on the information available to him.") (quoting Dreary v. Three Un–Named Police Officers, 746 F.2d 185, 192 (3d Cir. 1984)).

"Actual malice in the context of malicious prosecution is defined as either ill will in the sense of spite, lack of belief by the actor himself in the propriety of the prosecution, or its use for an extraneous improper purpose." Lee v. Mihalich, 847 F.2d 66, 70 (3d Cir. 1988), abrogated on other grounds Albright v. Oliver, 510 U.S. 266 (1994).

Plaintiff correctly argues that "absence of probable cause" to arrest may give rise to an inference of malice. Lippay v. Christos, 996 F.2d 1490, 1502 (3d Cir. 1993). That the state criminal charges against Plaintiff were held for trial does not change this result. In reaching its decision, the Municipal Court necessarily credited Defendant Officers' version of events. See Commonwealth v. McBride, 595 A.2d 589, 591 (Pa. 1991) (describing Commonwealth's burden at preliminary hearing).

Plaintiff also offers evidence that Defendants arrested him for an improper purpose: to retaliate against him for failing to supply information about Layre. (See McIntyre Dep. at 199:2–10.) Plaintiff offers his own version of their encounter and other evidence that Defendant Officers abused their authority to steal money and acquire information about "targets" of their suspicion.

If the jury accepts Plaintiff's evidence, it could reasonably find that Defendant Officers acted maliciously. Summary judgment is thus inappropriate.

### *Pennsylvania False Imprisonment*

Plaintiff must show Defendant Officers detained him unlawfully—that is, without probable cause. Renk, 641 A.2d at 293. Again, summary judgment is inappropriate because there are disputed facts underlying the question of probable cause to arrest.

### *Conspiracy*

It appears that Plaintiff alleges that after arresting him, Defendant Officers—acting in violation of federal and state law—conspired to deprive him of property and perpetuate his

detention.  (Compl., Doc. No. 1, ¶¶ 56–59.)

To prevail on his § 1983 conspiracy claim, Plaintiff must show that Defendants, "acting under color of state law 'reached an understanding' to deprive him of his constitutional rights." Jutrowski v. Twp. of Riverdale, 904 F.3d 280, 293–94 (3d Cir. 2018) (quoting Adickes v. S.H. Kress & Co., 386 U.S. 144, 150–52 (1970)).  To make out conspiracy, Plaintiff must show:

> that "(1) two or more persons conspire to deprive any person of [constitutional rights]; (2) one or more of the conspirators performs . . . any overt act in furtherance of the conspiracy; and (3) that overt act injure[d] the plaintiff in his person or property or deprive[d] the plaintiff of any right or privilege of a citizen of the United States," with the added gloss under § 1983 that "the conspirators act 'under the color of state law."

Id. at 294 n.15 (quoting Barnes Found. v. Twp. of Lower Merion, 242 F.3d 151, 162 (3d Cir. 2001) (second and third alterations added)).  State law conspiracy has the same elements and must be proven by "full, clear[,] and satisfactory" evidence.  Larsen v. Phila. Newspapers, Inc., 602 A.2d 324, 340 (Pa. Super. Ct. 1991).  Plaintiff has the burden at summary judgment to "raise a factual issue that sufficient proof exists" to support each element.  Id.

I must first determine whether Plaintiff has shown that "the object of the conspiracy was the deprivation of a federally protected right." Jutrowski, 904 F.3d at 295.  Once again, whether Defendants committed predicate violations of Plaintiff's constitutional rights is disputed.  To support his allegation that Defendants conspired to "conceal their own" unlawful and unconstitutional conduct, Plaintiff has offered evidence, including Defendants' purportedly false testimony at his state court preliminary hearing, his description of their conduct at the time of the search and arrest, and the allegedly fraudulent property receipt that reported a cash recovery of only $24,000.  (Tr. of Preliminary Hr'g at 14:20, 43:6–16; Arrest Rep. at 2; McIntyre Dep. at 196:6–200:4.)

To show an agreement, Plaintiff "must demonstrate that 'the state actors named as

defendants in the[ ] complaint somehow reached an understanding to deny [Plaintiff] his rights." Jutrowski, 904 F.3d at 295 (quoting Krost v. Kozakiewicz, 1 F.3d 176, 185 (3d Cir. 1993) (first alteration in original).  Plaintiff can make this showing with circumstantial evidence.  See id. "Because 'inferring mental state from circumstantial evidence is among the chief tasks of factfinders,' an allegation of conspiracy can only be overcome at summary judgment when 'the moving parties' submissions foreclose[ ] the possibility of the existence of certain facts from which 'it would be open to a jury . . . to infer from the circumstances' that there had been a meeting of the minds.'" Id. (first quoting Kedra v. Schroeter, 876 F.3d 424, 444 (3d Cir. 2017), then quoting Anderson, 477 U.S. at 249 (alterations in original)).  Defendants have not done so.

Defendants mischaracterize both the law and Plaintiff's theory of liability.  They thus urge that Plaintiff has failed to identify "specific instances" in which "Defendants plotted, planned[,] or conspired to carry out the events of Plaintiff's arrest." (L&S Mot. Summ. J. at 15.)   Yet, there is evidence that Defendants together participated in their initial encounter with Plaintiff, culminating in Plaintiff's arrest and imprisonment, his interrogation, and the preliminary hearing.  (See generally Tr. of Preliminary Hr'g; Liciardello Dep.; Spicer Dep.; McIntyre Dep.; Arrest Rep. at 2.) Viewed in the light most favorable to Plaintiff, these coordinated actions could support Plaintiff's allegation that Defendants conspired to frame an innocent man.  There is also evidence from which the jury could permissibly find that Defendants participated in an ongoing scheme to cover up constitutional violations by providing false testimony against Plaintiff at the preliminary hearing and completing a false arrest report.  See Jutrowski, 904 F.3d at 296; (see, e.g., Tr. of Preliminary Hr'g at 14:20, 43:6–16; Arrest Rep. at 2.)  If found by the jury, these acts violated both Plaintiff's Fourth Amendment right to be free from unreasonable search and seizure and his Fourteenth Amendment right to "adequate, effective, and meaningful" judicial access.  Vasquez

v. Hernandez, 60 F.3d 325, 328 (7th Cir. 1995) (internal quotation marks and citation omitted).

In light of these underlying factual disputes, summary judgment is inappropriate on Plaintiff's conspiracy claims.

### Qualified Immunity

Defendants argue they are immune from Plaintiff's federal claims. Qualified immunity shields state officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity thus has two components. I must determine: (1) whether Plaintiff has shown facts that "make out a violation of a constitutional right"; and (2) whether "the right at issue was 'clearly established' at the time of [D]efendant[s'] alleged misconduct." Id. Summary judgment is appropriate if either condition is not met. As I have discussed, Plaintiff has offered sufficient evidence which, if accepted by the jury, would establish that Defendant Officers violated his rights. My immunity determination turns on whether those rights were "clearly established."

"[T]he qualified immunity standard gives ample room for mistakes of judgment in protecting all but the plainly incompetent or those who knowingly violate the law." Hunter v. Bryant, 502 U.S. 224, 229 (1991) (internal quotation marks and citation omitted).

Plaintiff offers evidence to support his overarching allegation that Defendants conspired to arrest and charge an innocent person. Plaintiff alleges that Defendants searched his truck and cooler without probable cause or consent, arrested him without probable cause, stole his money, planted drugs on him, prepared a phony arrest report, and then testified falsely to secure and perpetrate the fraudulent charges against him. There is sufficient evidence to create triable issues as to these allegations. Defendants' intentional acts—if proven at trial—were hardly mistakes of

judgment.  None involved novel factual situations or triggered "on-the-spot judgment calls."  See Pahls v. Thomas, 718 F.3d 1210, 1222 n.5 (10th Cir. 2013).  Rather, each would amount to a knowing and purposeful violation well beyond the reach of qualified immunity.  See Malley v. Briggs, 475 U.S. 335, 341 (1986) (qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law"); Russo v. City of Bridgeport, 479 F.3d 196 (2d Cir. 2007) (qualified immunity unavailable at summary judgment where jury could find defendants acted intentionally).

### *Punitive Damages*

Defendant Officers ask me to dismiss with prejudice Plaintiff's "punitive damages claim" because, as they contend, Defendants did not act intentionally or with evil motive.  (L&S Mot. Summ. J. at 22.)  The law does not provide an independent claim for punitive damages; such damages are a remedy.  As I have discussed, there is evidence—if credited by the jury—that shows Defendants intentionally violated Plaintiff's constitutional rights.  Plaintiff will presumably present this evidence at trial.  Barring punitive damages at this time would thus be premature.  Accordingly, I will defer ruling on whether punitive damages are available until after Plaintiff rests at trial.  See Klein v. Madison, 374 F. Supp. 3d 389, 430 n.37 (E.D. Pa. 2019); see also Boring v. Google Inc., 362 F. App'x 273, 283 (3d Cir. 2010).

### B.    Municipal Liability

A federal civil rights claim against the City "may proceed in two ways": first, Plaintiff may show "that an unconstitutional policy or custom of the" City caused his injuries; second, Plaintiff may show that his injuries "were caused by a failure or inadequacy by the municipality that 'reflects a deliberate or conscious choice.'"  Forrest v. Parry, 930 F.3d 93, 105 (3d Cir. 2019) (quoting Estate of Roman v. City of Newark, 914 F.3d 789, 798 (3d Cir. 2019)); see Monell v.

Dep't of Soc. Svcs., 436 U.S. 658 (1978). The latter liability encompasses a municipality's failure to train, supervise, or discipline its employees. See id.

Although the two theories of liability are distinct and have different elements, they share a "close relationship." Id. at 106. Plaintiff emphasizes unconstitutional policy or custom liability, yet he also alleges that the City failed to supervise and discipline police Officers. (Compl. ¶¶ 66–70.) In opposing summary judgment, Plaintiff conflates the theories. (E.g. Plaintiff's Opp'n Br. at 36 ("Plaintiff also asserts that the City had a custom of failing to train . . . .").) In reversing a summary judgment grant in favor of a municipality on a Monell claim, the Third Circuit recently emphasized that "policy or custom" and "failure to train" are distinct and must be treated accordingly. See Forrest, 930 F.3d at 107 ("[T]he bare notion that a custom or policy of 'essentially unsupervised' officers led to [plaintiff's] injury has no basis in law."). Accordingly, I will address separately each of Plaintiff's Monell theories.

Plaintiff must first show he suffered a predicate constitutional injury at the hands of a state actor to make out either theory. As I have discussed, he has made such a showing. Although Plaintiff also offers evidence to support policy or custom liability, his failure to train and discipline contentions fail as a matter of law.

### *Policy or Custom*

Plaintiff charges that City officials collectively put their heads in the sand, ignoring repeated indications NFU was rife with corruption and criminality. Plaintiff thus alleges that the City: (1) inadequately investigated citizen complaints against PPD Officers and, correspondingly, failed to intervene to stop police misconduct; and, (2) allowed police illegalities to persist by refusing to implement corrective policies. (See Compl. ¶¶ 66–67.) These theories blend into a custom of municipal acquiescence in misconduct. Because Plaintiff does not argue that any of the

City's written policies are deficient, he proceeds under only the "custom" track. Custom, in this context, is a practice that is "persistent and widespread," "so permanent and well settled" as to carry "the force of law." <u>Monell,</u> 436 U.S. at 691.

The City all but concedes that summary judgment is inappropriate. It notes that Plaintiff has marshaled enough evidence to create a factual issue in "certain circumstances," yet insists that the City's deference to the "ongoing FBI investigation" relieves it of any responsibility. (City Reply Br., Doc No. 208, at 2.) I disagree. The City cites no authority (and I have found none) supporting the counterintuitive suggestion that a municipality is relieved of responsibility to prevent ongoing constitutional violations by its police because federal authorities are investigating those abuses.

To the extent the City suggests that it was unaware of NFU misconduct, the record shows just the opposite. Indeed, as have discussed at length, the record abounds with such evidence. Liciardello was found responsible for misconduct nine times, including once for stealing money and five times for executing unlawful searches or seizures. (Liciardello Concise Officer History); <u>see</u> <u>Beck v. City of Pittsburgh</u>, 89 F.3d 966, 973 (3d Cir. 1996) (pattern of written complaints sufficient for reasonable jury to conclude policymaker knew or should have known of violations). Walker testified that it was well known within the PPD that NFU Officers, including Defendants: misused "reliable sources," reaching side deals by which they corruptly profited; falsely averred to probable cause; stole money recovered from crime scenes; and targeted suspects based on opportunity to steal. (Walker Dep. at 756:4–763:14, 43:24–44:7, 736:14–16.) Walker further testified that an NFU Sergeant rebuffed his efforts to report misconduct. (<u>Id.</u> at 68:17–69:4.) Graham testified that Defendants were known—on the street, in court, and among their fellow Officers—for corrupt and criminal practices. (Graham Dep. at 41:7–43:12.)

There is additional evidence that the City knew of this misconduct: McCann, Douglas, and Graham testified that PPD officials, including Deputy Commissioner Blackburn, had reason strongly to suspect corruption and criminality within the NFU, yet refused to take any corrective action. (McCann Dep. at 16:17–17:2, 20:15–21, 61:8–12; McCann Memo; Douglas Dep. at 46:4–48:5; Graham Dep. 77:6–22, 100:1–18.) Graham recounted an instance in which an NFU Sergeant ignored Graham's report that Officers had improperly and suspiciously counted cash. (Graham Dep. at 52:5–23.) Commissioner Ramsey acknowledged receiving regular FBI briefings detailing NFU criminality and corruption, yet he closed the superficial IAB investigation of Officer Defendants' without taking any action. (Ramsey Dep. at 36:14–24.) Chief Inspector Flacco, with whom McCann spoke shortly after the Williams Letter, said that "[w]hat [McCann] related to [him about NFU corruption] was nothing new." (Flacco Dep. at 58:5–7.)

Worse, there is evidence that Defendant Officers (with help from their supervisors) manipulated the IAB to insulate themselves from oversight. Defendants received "leaks" of confidential information, were protected by "connections," and even threatened colleagues who reported misconduct. (See, e.g., Douglas Dep. at 46:18–47:15; Graham Dep. at 71:1–20; 89:2–14; Dmytryk FBI Interview at 4; see Walker Dep. at 68:3–69:8, 177:4–12); see Estate of Roman, 914 F.3d at 799 (official tolerance of repeated misconduct gives rise to Monell liability); Beck, 89 F.3d at 974 (an inert review system "perpetuate[s] the City's custom of acquiescing in" constitutional abuses). High level DAO officials (including the District Attorney himself) knew about the IAB's complicity in Defendant Officers' wrongs but took no corrective action. (SIU Memo.; Levins Rep.; McCann Dep. at 31:8–11, 47:20–24, 49:18–50:25, 66:2–21; Williams Dep. at 173:11–13.) Indeed, the DAO had received numerous complaints against NFU, prompting McCann to compile a "file." (McCann Dep. at 23:14–17, 25:10–16, 26:17–23.) For at least two

years before the Williams Letter, senior DAO prosecutors believed NFU Officers routinely committed misconduct. (Jackal Dep. at 22:13–23:11.) Yet, the DAO continued to rely on these Officers in hundreds of prosecutions until the Office finally issued the Williams Letter because it faced "another narcotics scandal." (McCann Dep. at 20:8–14; Douglas Dep. at 141:14–142:10.)

There is additional evidence that the City turned a blind eye to the IAB's complete ineffectiveness. For eight years before the Williams Letter, the DAO knew that the United States Attorney had stopped adopting cases involving Liciardello and other NFU Officers. (McCann Dep. at 50:2–6, 14–18.) Even when federal charges were anticipated, the City went no further than issuing the Levins Report, which was prepared in violation of accepted practices, and perfunctorily closed the investigation of the NFU Officers placed on a do-not-call list. (Levins Dep. at 10:11–13, 61:2–23, 63:22–23; Levins Rep.; Flacco Dep. at 49:17–53:1.) The Commissioner—who inexplicably closed the IAB investigation of NFU Supervisor McCloskey—raised no protest.

Making out an unconstitutional custom is necessary but not sufficient to survive a motion for summary judgment: Plaintiff must also show that the "custom was the 'proximate cause' of [his] injuries." Estate of Roman, 914 F.3d at 798. Plaintiff may make such a showing "by demonstrating an 'affirmative link' between the [custom] and the particular constitutional violation" alleged. Id. (quoting Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990)). In addressing the question of municipal custom of acquiescence, the Third Circuit recently explained that the municipality's knowledge through its policymakers of similar previous misconduct may supply this "affirmative link." Id. The "causation" analysis thus overlaps to some degree with the underlying unconstitutional custom of acquiescing in misconduct. This "affirmative link" theory of proximate cause has three pieces: (1) the City's awareness "of similar unlawful conduct in the

past"; (2) its failure "to take precautions against future violations"; and (3) "that this failure, at least in part, led to their injury." Bielevicz, 915 F.2d at 851.

Plaintiff has produced evidence to support each element of causation. First, as I have discussed at length, the record shows that the City's "policymakers were aware of similar unlawful conduct" as that Plaintiff alleges here. Id.; see also City of Saint Louis v. Praprotnik, 485 U.S. 112, 124–26 (1988) (plurality op.); Estate of Roman, 914 F.3d at 798. Second, the City took no action until the DAO finally issued the Williams Letter, thus allowing Defendant Officers' unconstitutional conduct to persist. Finally, Plaintiff offers evidence that Defendant Officers unlawfully searched and arrested him—the very wrongs that the City deficiently failed to prevent or correct. See Bielevicz, 915 F.3d at 851 ("[I]t is logical to assume that continued official tolerance of repeated misconduct facilitates similar unlawful actions in the future.").

Because there are thus triable issues as to both unconstitutional municipal custom and causation, summary judgment is inappropriate.

### *Failure to Train, Supervise, or Discipline*

Plaintiff's alternative theory—that the City is liable for failing to train Officers "against a code of silence," and failing to supervise and discipline "rampant illegal conduct in narcotics investigations"—fails as a matter of law. (Plaintiff's Opp'n Br. at 36 (citing Compl. ¶¶ 66–69).)

A municipality may be liable for failing adequately to train, discipline, or supervise its employees only where the failure "reflects a 'deliberate' or 'conscious' choice by [the] municipality" that "amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton v. Harris, 489 U.S. 378, 388 (1989). The "deliberate indifference" requirement harmonizes failure-to-train liability with Monell's "policy or custom" rule: a municipality is liable only when "its policies are the moving force behind the constitutional

violation." Id. at 389 (internal quotation marks and alteration omitted).

Plaintiff identifies no evidence to show a failure to train. Plaintiff does not dispute that the PPD issues Directives requiring Officers to report misconduct, confidentially if necessary. There is no evidence suggesting that the Defendant Officers were confused as to the propriety of their alleged misconduct, or that additional training would have made such misconduct less likely. Accordingly, "there is no proof from which to infer that implementing" different training practices "would have made any difference." Forrest, 930 F.3d at 109.

## V.    LITIGATION CONDUCT

Deciding Defendant Officers' Motion has been made more difficult by their lawyer's apparently intentional decision to ignore the law, misstate the record, and argue less than scrupulously. The gravamen of Plaintiff's Complaint is that the Officers framed an innocent man: they stopped and jailed him for no lawful reason; planted illegal drugs on him; stole some of the cash he was carrying; and then lied about their actions in arrest reports and during state court proceedings. (Coml. ¶¶ 10–18, 22– 25.) Defense counsel acknowledges that at summary judgment, I am obligated to credit Plaintiff's testimony and related evidence, even though the Officers vigorously dispute them. (See L&S Mot. Summ. J. at 2.) Yet, defense counsel urges me to grant summary judgment based on his clients' version of events: that Plaintiff gave the Defendant Officers permission to search his truck (id. at 6); that they recovered illegal drugs from the cooler (id. at 7); that Plaintiff lied about the Officers' actions (id. at 10); and that no record evidence supports Plaintiff's allegations (id. at 21). As bad, counsel urges that because— according to the Officers—their actions did not violate "a clearly established law," they are protected by qualified immunity. (Id. at 21.)

The Defendant Officers' Summary Judgment Motion is thus a trial brief. When urging a

defense verdict, counsel will be free to ask the jury to credit his clients' evidence and discredit that of Plaintiff.  In urging me to make those same credibility determinations and so grant summary judgment, counsel's good faith is in doubt.   Although I appreciate the need for zealous advocacy, zeal has its limits. <u>See</u> Pa. R.P.C. 3.3(a)(1).  At present, I will defer further addressing counsel's conduct.  <u>See</u> 28 U.S.C. § 1927; Fed. R. Civ. P. 11; <u>see also</u> <u>Martin v. Brown</u>, 63 F.3d 1252, 1265 (3d Cir. 1995) (court has inherent authority to sanction attorney misconduct).

## VI.    CONCLUSION

I will dismiss Plaintiff's emotional distress claims against Defendant Officers and his failure to train claim against the City.  I will otherwise deny both Motions.

An appropriate Judgment follows.

**AND IT IS SO ORDERED.**

*/s/ Paul S. Diamond*
_____
February 7, 2020                                             Paul S. Diamond, J.